**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

**HARRY R. HALL AND CYNTHIA HALL,**

    **PLAINTIFFS,**

    **VS.**

**OCWEN LOAN SERVICING, LLC, et al.,**        **Case No.: 2:19-cv-00254-WC**

    **DEFENDANTS**

## PLAINTIFFS' STATEMENT OF THE FACT AND LEGAL MEMORANDUM IN OPPOSITION TO THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COME NOW Plaintiffs and, in response and opposition to the Motion for Summary Judgment filed by Defendants Ocwen Loan Servicing, LLC ("Ocwen") and Federal Home Loan Mortgage, Corporation ("Freddie Mac") submit as follows:

## SUMMARY

At the center of this case is a payment dispute dating back to the implementation of the modification of the Halls' mortgage in April 2014. The problem began when Ocwen called Mr. Hall and told him that, because there was a surplus from past overpayments, he only needed to pay $297.58 instead of his modified mortgage payment. He did so. Ocwen thereafter, and throughout the time it serviced the loan, treated that payment as "short" and treated the loan in arrears. The Halls have made all their payments since, but for over 6 years Ocwen has treated them as if they

are behind.  This has resulted in numerous default letters, foreclosure threats and adverse credit reporting.

The controlling legal and factual reality is that this same payment dispute was litigated in the Halls' bankruptcy.  The dispute culminated in the Halls' Motion to Deem Mortgage Current.  And the dispute was resolved when the bankruptcy court unambiguously declared, on April 30, 2018, that the Halls were current through April 2018.  An order was later entered memorializing that finding.  Ocwen did not oppose the motion, nor did it seek to vacate or appeal the order.   To the contrary, Ocwen, through its attorney and after "full review of the pay history," agreed that the loan was current.

Undeterred by the court's order (and it's own representations), Ocwen continued to service the loan as if it was in arrears.  It made no corrections. This resulted in the Halls' Notice of Servicing Error and credit reporting disputes.  Ocwen failed to make any corrections in response to the Halls' letters, which the Halls claim is a violation of federal law and breach of the mortgage.   In defense of those claims, Ocwen now asserts what it chose not to assert before the bankruptcy order - that the loan has been in arrears since April 2014.  Because Ocwen is estopped from re-litigating that issue and because the evidence supports the Halls' claims, the motion for summary judgment is due to be denied.

## STATEMENT OF RELEVANT FACTS AND EVIDENTIARY SUBMISSION

### The Halls' Mortgage Loan and the Chapter 13 Bankruptcy

1.      The basic facts surrounding the subject mortgage loan set out in Paragraphs 1 and 2 of Defendants' Memorandum in Support of Its Motion for Summary Judgment ("Supporting

Brief")(Doc. 76) are not disputed.  The loan is secured by the Halls' home at 5820 Carmichael Road, Montgomery, Alabama. (Deposition of Harry Hall ("H. Hall Depo."), excerpts of which are attached hereto as Exhibit 1), pp. 19-22.

2.      The Halls' loan was a fixed rate loan with monthly principal and interest payments of $1,052.21 with an interest rate of 6.000 percent. The payments are due on the first of each month but there is a grace period of fifteen calendar days before a payment is considered late. The Note allows the Lender to charge a late fee of 5% of the overdue payment if said payment is received after the fifteen-day grace period.   (Doc. 76-1, pp. 2-3).

3.      It is undisputed that Ocwen began servicing the Halls' loan on February 16, 2013 and that, at all relevant times, Ocwen serviced the loan on behalf of Federal Home Loan Mortgage Corporation ("Freddie Mac"), the owner of the loan. (Doc. 76, ¶ 3).  At the time Ocwen began servicing the loan, it was considered in default. (Doc. 79-19, p 2).

4.      On July 2, 2013, all beneficial interest in the Halls' mortgage was assigned to Ocwen by recorded Assignment of Mortgage.  (Exhibit 2).

5.      The Halls filed for relief under Chapter 13 Bankruptcy on September 3, 2013 in the Middle District of Alabama (Case No. 13-32290) and listed Ocwen as a creditor.  Ocwen filed a Proof of Claim listing an arrearage amount and other charges totaling $7,720.63. (Doc. 76, ¶ 4). The Halls' confirmed Bankruptcy Plan provided for payment of 100% of creditors' claims,

including Ocwen's and, in fact, Ocwen's arrearage claim was paid during the bankruptcy.[1] (Exhibit 3)

**The Loan Modification**

6.      It is undisputed that the Halls were approved for a modification on or about November 6, 2013 and that they met all of the trial plan requirements.  (Doc. 76, ¶ 5.).  Prior to entering into the permanent loan modification agreement, the Halls were required to make three trial plan payments, each in the amount of $1,291.83, totaling $3875.49. The Halls made three trial plan payments that exceeded the amount due by $122.68.  (Flannigan Depo. (Ex. 4), pp. 53-54).

7.      On April 16, 2014, the Loan Modification was approved by the Bankruptcy Court, making their loan current. The new monthly payment, with principal and interest included, became $757.04. (Ex. 5).

8.      It is undisputed that the loan was permanently modified by agreement dated December 27th, 2013, that the modification was approved by the Bankruptcy Court on April 16 2014 and that the Halls made payments required under the modification in March in April of 2014. (Doc. 76, ¶¶ 8-9). The new total monthly payment, including escrow items, pursuant the modification was $1,142.74. (Flannigan Depo. (Ex. 4), p. 56, Lines 11-22).

**Ocwen Instructs The Halls to Pay a Lower Amount**

9.      Around the time the modification became effective, there was confusion on Ocwen's part as to the amounts owed.  It is undisputed that on April 21, 2014 an Ocwen agent

---

[1] The Bankruptcy Court approved a loan modification that brought the loan current. (Ex. 5).

called Mr. Hall to discuss the amounts due.  The agent instructed him to pay $297.58 for the May 2014 payment, which he did on May 2nd.  (Doc. 76, ¶ 12).  However, it is *disputed* that this was not the amount due and therefore a "short payment," as characterized by Ocwen. At the time Mr. Hall was told to pay $297.58, there was a total of $846.28 in his suspense account (made up entirely of overpayments made by him).   The $297.58 he was told was owed when added to the $846.28 in suspense totals $1143.86, just over the full modified payment amount of $1,142.74 that was due for May.  (Flannigan Depo. (Ex. 4), pp. 59-62); (H. Hall Depo., (Ex. 1), pp. 34-35) and Doc 76-4 at p 6.)

10.    The April 21st verbal instruction to pay only $297.58 is documented in Ocwen's transaction log which is part of its business records.  The entry confirms that he was told to pay $297.58 in May and $1142.74, from June onwards. (Doc 79.20 – Filed Under Seal).

11.    Although the modification was in place in April 2014, Ocwen applied payments received in May and June as if there were no modification.  This was caused by Ocwen's delay in documenting the modification on its system.  In any event, it caused Ocwen to consider payments made in accordance with the modification short.  (Flannigan Depo. (Ex. 4), pp. 65-68).

12.    The modification was finally "boarded" onto Ocwen's system in August 2014.  At that point, retroactive corrections were made so that the payments received after the effective date were applied in accordance with the modified amount.  (Id. pp. 67-68).  However, Ocwen's system still regarded the Halls one month behind because it considered the May 2014 payment short, even though that payment was made according to the Ocwen's instructions and, at the time the payment was made, there was sufficient overage in the suspense account to comprise a full payment.  (Id., pp. 68-69)(Doc. 76, ¶ 15).

5

**The Halls Make All Post-Petition Payments But Ocwen Holds them In Default Leading to  the Motion to Deem Current**

13.     After May 2014, the Halls made payments in the full amounts owed under the modification each month.  However, because Ocwen considered the May 2014 payment to have been short, it continued to treat the loan as if it was one-month in arrears.  (Id., (Ex. 4), pp. 68 and 94-98).

14.     Over the preceding several years, Mr. Hall called Ocwen numerous times seeking an explanation for why it continued to consider him behind when he was making payments each month. He was given conflicting answers. (H. Hall Depo. (Ex. 1), pp. 29-30); (Deposition of Cynthia Hall ("C. Hall Depo."), (excerpts of which are attached hereto as Ex. 6, p. 39)

15.     Meanwhile, the Halls continued to make their monthly mortgage payments, as well as their Chapter 13 payments, and in February 2018 they completed their Plan.  On February 15, 2018, the Trustee filed its Notice of Completion of Plan Payments. (Ex. 7).

**The Halls' Motion to Deem Current and the Order Granting Same**

16.     That same day, the Trustee issued to Ocwen a Notice of Final Cure pursuant to Bankruptcy Rule 3002.1(f) stating that Ocwen's claim for mortgage arrearage was paid in full. (Exhibit 8).

17.     When a debtor completes all payments to a mortgage creditor Fed. R. Bankr. P. 3002.1(f) requires that the trustee to file a notice that the arrearage is cured. Fed. R. Bankr. P. 3002.1(g) requires the mortgage creditor to file a response stating whether or not it agrees with the trustee  that the debtor has paid in full the amount required to cure the default and whether the debtor has made all required post-petition payments. Within 21 days after service of the Notice of

Final Cure a mortgage creditor, the debtor or trustee can file a motion to deem current if there is a

asking the Bankruptcy Court to make a final determination.  Fed. R. Bankr. P. 3002.1(h).

18.      On February 27, 2018, Ocwen filed its Response to Notice of Final Cure stating

that the Halls were one month behind on their post-petition payments. (Doc. 76, ¶ 21)(Exhibit 9).

19.      In response, the Halls filed a Motion to Deem Post-Petition Mortgage Payments

Current on March 26, 2018, contesting Ocwen's position that they were one month behind and

asserting that every required post-petition payment was made. The Halls requested that the court

determine that the "Debtors are current on their post-petition mortgage payments."  Attached to

the motion was a list of payments made by the Halls and the months the payments were due.

Although Ocwen now claims that the information attached to the motion was incorrect. (Exhibit

10). However, Ocwen failed at the time to file any opposition to the Motion to Deem Court

submission or submit any information supporting a position that the loan was one month in arrears.

In fact, as stated below, Ocwen, through counsel, confirmed that the loan was current and it

consented to the Order Granting The Motion To Deem Current. (Ex. 13).

20.      The Halls received a Chapter 13 Discharge on March 27, 2018.  (Doc. 76, ¶ 22).

Subsequently a hearing was scheduled for April 30, 2018 on the Halls' Motion To Deem Current.

21.      During the weeks leading up to the hearing, Gail Donaldson, the Halls' bankruptcy

counsel, and Helen Ball, Ocwen's counsel, exchanged a series of emails regarding the payment

status.  Ms Ball sought additional evidence that the April payment was made.  On April 27th, after

payment records were provided by Ms Donaldson, Ms Ball reported the following:

> After a **full review of the pay history, we agree that the Debtor is current through April 1, 2018 payment**.   We will not attend the hearing.  Do you mind announcing? Thank you, Helen

Helen Ball Managing Attorney 704-607-4881 Office
hball@logs.com | www.shapiro-ingle.com

(Exhibit 11)(emphasis added).

22.     By confirming, on April 27th, that the Halls were current "through April 1, 2018 payment." Ocwen confirmed that the Halls were current and that it did not oppose the Motion to Deem Current and accordingly, the motion was granted at the hearing.  (Exhibit 12).

23.     At the hearing, Ms Donaldson conveyed Ms. Ball's representation in her April 27th email and, based on Ocwen's agreement that the loan was current, the court granted the motion. Here is the exchange:

COURTROOM DEPUTY:  Chapter 13 case, 13-32290, Harry and Cynthia Hall.

THE COURT:  Ms. Donaldson.

MS. DONALDSON:  Your Honor, Ms. Ball (phonetic) has agreed that the debtor is current through April 1st and so --and Ocwen just issued that the debtors are current on their mortgage through April 1st of this year.

THE COURT:  Okay.  So we'll grant the motion.  Find debtors are current on their mortgage.  Okay.

(Exhibit 12 (transcript), p 2.).

24.     On May 15th, the court entered an order titled "ORDER GRANTING MOTON TO DEEM MORTGAGE CURRENT" memorializing the April 27th finding that "the debt to the creditor is current through April 1, 2018." (Exhibit 13).  Ocwen agrees that the dispute addressed in the Motion to Deem Mortgage Current, which was resolved by this court order, is the same "rolling delinquency" dispute that dates back to April 2014 when Mr. Hall made the "short payment" based on what Ocwen told him to pay.  (Flannigan Depo. (Ex. 4), pp. 93-94 and 146)

8

**Ocwen Continues to Treat the Loan in Default Despite Order**

25.     Unfortunately, this was not the end of the story. Ocwen has since serviced the loan as if none of this happened. Ocwen totally ignored its attorney's representation to the Halls' attorney, and indirectly to the Bankruptcy Court, that the loan was current; and it ignored the Bankruptcy Court's finding that the loan was current. In fact, Ocwen made no adjustments to its system to align it with the Order.  (Flannigan Depo. (Ex. 4), pp. 95-97, 103-04).

26.     As a result, Ocwen has continued to service the loan as if it was one month in arrears.  In other words, the May 2018 payment was applied to April, the June 2018 payment was applied to May and so on.  (Flannigan Depo. (Ex. 4), pp. 95-97).  This has resulted in a steady stream of collection letters claiming the Halls were in default. (See Exhibit 14).

**The Halls' Notice of Servicing Error and Owen's Response**

27.     The Halls made numerous telephone calls requesting Ocwen correct to their account, but Ocwen kept ignoring the Bankruptcy Court's order and continued to hold the Halls in default.  On November 27, 2018, Plaintiffs mailed Ocwen a letter stating that Ocwen was falsely claiming that they were in arrears, that their arrearage had been paid through the Chapter 13 Bankruptcy and that they had made every payment since the discharge.  (Exhibit 15).

28.     The Halls' letter was received by Ocwen on December 5th.  (Flannigan Depo. (Ex. 4), p. 107).  It was handled by Ocwen's Research Department, which is tasked with responding to RESPA Notices of Servicing Error.  (Id., p. 104.)

29.     Ocwen provided a substantive response letter dated December 19, 2018. (Exhibit 16).  However, that letter failed to address the Halls' specific concerns and instead contained generic and irrelevant information, along with the conclusory and unsubstantiated statement that

"[a]ll the payments were received and applied to the mortgage account correctly." (Id.). The substantive information provided in the letter was the following:

- That GMAC (the former servicer) filed bankruptcy prior to transferring servicing to Ocwen. This is information not requested or even remotely relevant to the Halls' dispute.

- That after the acquisition of GMAC's assets out of bankruptcy Ocwen converted its systems. More unrequested and irrelevant information.

- That the Halls filed bankruptcy and were discharged in March 2018. This is information known, not requested and actually provided in the Halls' letter.

- That the loan was modified in August 2014. This too was known and unrequested.

30.     Nothing in the letter specifically addressed the fact that Halls' had not missed any payments, nor did Ocwen provide a "[s]tatement of each payment you claim we have not made since you began servicing the loan," as the Halls requested. (Exhibit 16).

31.     Also, there is no indication that Ocwen did anything to investigate the errors outlined in the Halls' letter, other than to pull together the non-responsive and irrelevant information listed above.  Ocwen's witness, designated to testify on the actions taken in response to the Halls' letter,[2] could not identify any actions taken to investigate the letter other than the information in the response letter. There are no notes, or any other documentation of the tasks performed; nor is there any identification of the persons who worked on the response.  Ocwen's representative was unaware of any system used by Ocwen to document the actions taken in response to NOEs received by borrowers. (Flannigan Depo. (Ex. 4), pp. 109-111).

_____

[2] See Notice of Deposition, Exhibit A (Matters), No. 4, attached hereto as Exhibit 20).

32.     It is undisputed that Ocwen made <u>no</u> corrections or changes to the loan account as a result of or in response to the Halls' November 27th letter.  (<u>Id</u>., pp. 114-116).  In fact, there is no indication in Ocwen's systems of any actions taken other than simply writing the boiler-plate filled response letter.  (<u>Id</u>.).

33.     John Rao, Plaintiffs' designated expert, will testify that industry standards would have required Ocwen to recognize that its representatives had instructed the Halls to make payments in an amount (this is reflected in Ocwen's own records) lower than the contractual amount owed; that the Halls relied on those instructions; and that this mistake caused the "rolling delinquency."  Industry standards also required that Ocwen waive negative effects of the Halls' reliance on its agents' representatives.  Ocwen deviated from industry standards when it failed to consider the loan as current after, in response to the Hall's Motion to Deem Current, it consented to the entry of an order granting that motion and declaring the loan current.  Industry standards would compel Ocwen to either service the loan consistent with the Plaintiff's Motion to Deem Current and the Order granting same or, if it continued to believe that the Halls were behind, file a motion to vacate the Order.  Instead, Ocwen serviced the loan as if there was no order.  (Doc. 76-4).

### Ocwen's False Credit Reporting

34.     Ocwen reports to the credit bureaus the payment status reflected in its servicing records.  (<u>Id</u>., pp. 117-118).  In other words, if Ocwen's servicing system treats a loan as 30 days in arrearage, it automatically reports the same information to the credit bureaus.  (<u>Id</u>.)

35.     At all times after the Bankruptcy Court's ORDER GRANTING MOTION TO DEEM MORTGAGE CURRENT Ocwen has reported to the credit bureaus that the loan is 30-59 days delinquent.  (Exhibit 17).

36.     The Halls disputed Ocwen's credit reporting on several occasions, including dispute letters dated March 29, 2018 and January 30, 2019 sent to each of the major credit bureaus. (Exhibits 18 and 19).

37.      The disputes were forwarded from the bureaus to Ocwen through the E-OSCAR system used industry-wide for that purpose.  (Flannagan Depo. (Ex. 4), pp.119-20).  In response to the disputes, Ocwen reported that the delinquency information was correct, and it requested no changes to the reporting.  (Id., pp. 122-125).

38.     Ocwen's witness could not identify to any specific tasks performed in response to the dispute except that Ocwen employees review the information in Ocwen's database to determine whether or not it's accurate." (Id., pp. 125-126).

**Effect of Ocwen's Failure to Correct its Servicing Error on the Halls**

39.     Mr. Hall testified about other mistakes and problems with Ocwen, such as frequent misapplication of payments and improper insurance charges.  He would send proof of payment for one month and Ocwen would then claim that a different month was the problem.  Ocwen would charge him for insurance when he was already insured. Numerous times he received calls from Ocwen treating to foreclose on his home.  In late 2014 he started treatment for high blood pressure and heart problems. He believes that his ordeal with Ocwen has contributed to this because he had never had these symptoms until these problems with Ocwen started. He testified that that his doctor

12

told him that his heart problems with the result of stress.) (H.Hall Depo. (Ex. 1), pp. 203-204).

40.     Also, the Halls received hundreds of collection calls from Ocwen's collectors during the relevant period. (H.Hall Depo. (Ex. 1), pp. 55);

41.     Ocwen's refusal to correct its servicing to reflect that the Halls are current has effected them in serval ways.  First, it caused fear and anxiety over possibly losing their home in foreclosure; drastic reduction in their credit scores, causing them to be denied credit and pay higher rates for the credit they've needed; and the stress has exacerated Mr. Halls' heart problems and high blood pressure.  (Response to Interrogatories, Doc. 76-7)(H.Hall Depo. (Ex. 1), pp. 196-211 and 203-204); (C. Hall Depo. (Ex. 6), pp. 89-91).

### Ocwen's Servicing and Debt Collection

42.     Ocwen is a Mortgage Loan Servicer.  As servicer and as a regular part its business, Ocwen collects amounts owed under mortgage loans that are held by an "investor" (i.e., owner of the loan), such as Freddie Mac; and it uses the U.S. Mail and other interstate means to collect sums owed to the investor. Those actions include making interstate collection calls and taking actions in bankruptcy court on behalf of the true creditor and holder of the mortgage.  (Flannagan Depo., (Ex. 4), pp. 24-28).

**LEGAL ARGUMENT**

**A. THE BANKRUPTCY COURT UNAMBIGUOUSLY DECLARED THE LOAN CURRENT AS OF APRIL 2018 AND OCWEN IS COLLATERALLY ESTOPPED FROM TAKING CONTRARY POSITION**

It is undisputed that on April 30, 2018 the Bankruptcy Court declared that, as of that date, the Halls' loan was current. It is also clear from the exchange between counsel leading up to the hearing that Ocwen represented to the Halls attorney that it had conducted a "full review of the payment history" and agreed that the loan was current. Therefore, it was not opposing the motion and Ocwen's attorney would not attend the hearing. (Exhibit 11). As demonstrated by the transcript, the Halls' attorney conveyed that representation to the court at the hearing and the court declared the loan current: "So we'll grant the motion. Find debtors are current on their mortgage. Okay." (Exhibit 12). Ocwen could have, of course, opposed the motion and brought before the bankruptcy court the arguments it advances here. But it chose not to and the issue was fully resolved by the bankruptcy court. The resulting order is as binding as any other federal court order and Ocwen is estopped from taking any contrary position in this action.

"The normal rules of res judicata and collateral estoppel apply to the decisions of bankruptcy courts." Katchen v. Landy, 382 U.S. 323, 334, 86 S. Ct. 467, 475, 15 L. Ed. 2d 391 (1966). As such, that order collateral estops Ocwen's from taking an inconsistent position, including that the Halls were delinquent after April 1, 2018. Matrix IV, Inc. v. Am. Nat. Bank & Tr. Co. of Chicago, 649 F.3d 539, 549 (7th Cir. 2011)(party to prior bankruptcy order estopped form asserting fraud claim where same argument was made and rejected in context of bankruptcy courts approval for asset sale); Tornheim v. Fed. Home Loan Mortg. Corp., 198 F.3d 235 (2d Cir.

14

1999)(conversion claim estopped by prior bankruptcy order determining that no property damage occurred); Feingold v. Office of Disciplinary Counsel, No. 17-CIV-21340, 2018 WL 1470315, at *2 (S.D. Fla. Mar. 26, 2018), appeal dismissed sub nom. In re Feingold, No. 18-11762-FF, 2018 WL 3634036 (11th Cir. June 14, 2018)(applying collateral estoppel to prior bankruptcy order).

"Collateral estoppel bars re-litigation of a previously decided issue when the parties are the same (or in privity) if the party against whom the issue was decided had a full and fair opportunity to litigate the issue in the earlier proceeding."   In re Se. Banking Corp., 69 F.3d 1539, 1552 (11th Cir. 1995).   Collateral estoppel applies where: "(1) the issue at stake is identical to the one involved" in the earlier proceeding; "(2) the issue was actually litigated" in the earlier proceeding; "(3) the determination of the issue ... must have been a critical and necessary part" of the earlier judgment; and "(4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue." Tampa Bay Water v. HDR Eng'g, Inc., 731 F.3d 1171, 1180 (11th Cir. 2013) (quoting Dana v. E.S. Originals, Inc., 342 F.3d 1320, 1323 (Fed. Cir. 2003).

Each of these requirements is present here.   There can be no doubt that the issue of whether the Halls' mortgage was current as of April 1st was actually litigated in the bankruptcy court and that it was a critical and necessary part of the Motion to Deem Mortgage Current.   It was the sole issue addressed in that motion.   And it is certainly true that Ocwen had the "full and fair opportunity" to litigate the issue.   Nothing prevented Ocwen from presenting to the bankruptcy court the same "rolling delinquency" theory and argument that the Halls created the delinquency with the "short" payment it advances here.   But it chose not to.   After its "full review of the pay history," it announced to the Halls' lawyer that it agreed that the loan was current and it choose not to contest the motion, resulting in the order.   Having made that decision, Ocwen is not

15

permitted to use a second bite at the apple to justify its failure to comply with that same bankruptcy order.  Accordingly, this Court should deem Ocwen estopped from arguing here that the Halls were delinquent after April 1, 2018.  Specifically, the Court should disregard Ocwen's argument here that its response to the Halls' NOE and credit reporting dispute was reasonably based on a belief that the loan was one month in arrears.  Any such belief, after April 2018, is unreasonable as a matter of fact because it ignores the order deeming the loan current, and it is unreasonable as a matter of law because of the *res judicata* effects of that bankruptcy court which presents Ocwen from re-litigating the same issue as a defense to the Halls' claims.

## B.  THE EVIDENCE SUPPORTS THE HALLS' RESPA CLAIM

RESPA grants borrowers' the right to provide written notice of servicing error ("NOE") setting out "reasons for the belief of the borrower, to the extent applicable, that the account is in error," and requires the servicer to investigate the alleged error and "make appropriate corrections in the account.."  12 U.S.C.A. § 2605(e)(1)(B)(ii) and (e)(2)(A).  The 2013 amendments to Reg. X (RESPA's implementing regulations) clarify servicers' duties in responding to NOEs.   The servicer's duty goes well beyond simply responding to a RESPA letter, imposing both substantive and procedural requirements.  Substantively, the servicer must perform a *reasonable investigation* of the noticed error and is liable to the borrower for any failure to correct errors a reasonable investigation would have revealed.  Procedurally, the servicer must provide a written response that substantively addressed the concerns raised in the letter stating either (1) that no error occurred (and explaining the basis for that conclusion) or (2) that an error was found (and outlining the corrections made). 12 C.F.R. § 1024.35(e); Renfroe v. Nationstar Mortg., LLC, 822 F.3d 1241, 1246 (11th Cir. 2016) (citations omitted). "Basically, a servicer must respond by fixing the error,

16

crediting the borrower's account, and notifying the borrower; or by concluding that there is no error based on an investigation and then explaining that conclusion in writing to the borrower." Id., 822 F.3d at 1244. "Even where a servicer concludes that no error occurred, RESPA mandates that the servicer, among other things, '[c]onduct a reasonable investigation.'" Diehl v. Money Source, Inc., 2018 WL 2995721, at *6 (S.D. Ala. June 13, 2018).

Ocwen attacks the RESPA claim on two grounds: (1) There is no evidence upon which the jury could conclude that it failed to properly respond to the NOE; and (2) the Halls have no actual damages from any failure to comply.  Neither have merit.

### 1.  Ocwen's Response and its Failure to Make Corrections Violated RESPA.

Without explanation, Ocwen extolls the "depth" and "accuracy" of tis NOE response.  But saying so does not make it so.  The response is neither "deep" nor "accurate."  In reality, the letter provided irrelevant and unresponsive information regarding the servicing history or the loan, GMAC's bankruptcy and the modification, plus the boilerplate conclusion, devoid of details, that "[a]ll the payments were received and applied to the mortgage account correctly."  A servicer does not comply with RESPA with a response filled with generic boilerplate or bare conclusory language.  Renfroe v. Nationstar Mortg., LLC, 822 F.3d 1241, 1244–45 (11th Cir. 2016)(violations of RESPA established where servicer's response letter contained boilerplate statements and bare conclusion that no error occurred without explaining why the suspected errors were not present); Saccameno v. Ocwen Loan Servicing, L.L.C., 372 F. Supp. 3d 609, 641 (N.D. Ill. 2019) (servicer's response incorrectly identified plaintiff as another borrower, suggesting servicer had responded by "cutting and pasting text" from its response to another borrower; "Boilerplate responses of this sort are insufficient to meet RESPA's requirements."), remanded on other grounds, 943 F.3d

17

1071 (7th Cir. 2019); <u>Lage v. Ocwen Loan Servicing L.L.C.</u>, 2015 WL 7294854, at *13 (S.D. Fla. Nov. 19, 2015) ("The sending of a template or form letter which fails to substantively address concerns raised by the borrower's inquiry does not satisfy the servicer's obligations under Regulation X's error resolution procedures."); <u>Marais v. Chase Home Fin., L.L.C.</u>, 24 F. Supp. 3d 712, 723–724 (S.D. Ohio 2014) ("form letter with no individualized features" did not satisfy servicer's duty under section 2605.). The statements in the response must also be accurate. <u>St. Claire v. Ditech Fin., LLC</u>, No. 1:17-CV-3370-AT-JFK, 2018 WL 4850127, at *8 (N.D. Ga. Sept. 21, 2018).

Ocwen's conclusory statement that it applied all payments "correctly" ignores the bankruptcy Court Order declaring the loan current in April 2018. There is nothing "correct" about continuing to apply payments as if they are a month in arrears in direct defiance of a court order declaring the loan current. Moreover, as explained above, the binding effect of the Bankrupcyt Order prevents Ocwen from arguing, in defense of its response, that the loan was in fact in arrears. The existence of that order and the fact that the Halls timely made every payment since that order is more than sufficient evidence upon which the jury could find that the statements in the response were not only non-responsive but also false.

Moreover, there is more than sufficient evidence supporting a conclusion that Ocwen failed to conduct any reasonable investigation or made appropriate corrections. Whether an investigation is reasonable is a fact question for the jury. <u>Hinkle v. Midland Credit Mgmt., Inc.</u>, 827 F.3d 1295, 1303 (11th Cir. 2016); <u>Westra v. Credit Control of Pinellas</u>, 409 F.3d 825, 827 (7th Cir. 2005). Any reasonable investigation would, at a minimum, include review of the information and

documents available.  Hinkle, 827 F.3d at 1305; Johnson v. MBNA Am. Bank, NA, 357 F.3d 426, 431 (4th Cir. 2004); "[T]he term "investigation" itself denotes a 'fairly searching inquiry,' or at least something more than a merely cursory review."  Boggio v. USAA Fed. Sav. Bank, 696 F.3d 611, 616 (6th Cir. 2012); see also Wirtz v. Specialized Loan Servicing, L.L.C., 886 F.3d 713, 717 (8th Cir. 2018) ("Given the ordinary meaning of "investigation" and the purpose of RESPA, we conclude that § 2605(e)(2)(B)-(C) imposes a substantive obligation on mortgage loan servicers to conduct a reasonably thorough examination before responding to a borrower's qualified written request."); Burdick v. Bank of Am., 2015 WL 4555239, at *5 (S.D. Fla. July 28, 2015) (servicer's response to notice of error asserting that notice was not "timely and must be made within the context of [his] bankruptcy" was not a sufficient "written explanation or clarification" of the issues in dispute); Marais v. Chase Home Fin., L.L.C., 24 F. Supp. 3d 712 (S.D. Ohio 2014) (servicer did not conduct an investigation when it simply stamped the request as received, verified the loan number, and sent a form letter to the borrower enclosing copies of documents it pulled from its online system).

There is ample evidence from which a jury could conclude that Ocwen failed to conduct a reasonable investigation.  To begin with, Ocwen has no record of the actions, if any, taken in response to the NOE, other than the response letter itself.  Nevertheless, although Ocwen can't say what it did to investigate the error, the evidence tells us that, at the time it received the NOE, Ocwen knew there was an on-going dispute regarding whether the loan was current, dating back to April 2014, that it had instructed the Halls to make the "short" payment back in April 2014, that the dispute was litigated in the bankruptcy court after the Halls filed their Motion to Deem Mortgage Current and, most importantly, that the court entered an order granting that motion and

19

declaring the loan current.  The jury could easily conclude that any reasonable investigation would necessarily include consideration of the bankruptcy order and that, based on that order, Ocwen should have corrected its records to reflect that the loan was current.

### 2.  Halls Suffered Actual Damages Recoverable under RESPA

As described above, the Halls have been profoundly effected by the Oc's refusal to correct its servicing.  These effects include exacerbation of Mr. Hall's medical problems, credit denials and payment of high rates of credit, and fear and anxiety over the prospect of losing their home to foreclosure.  (See Paragraphs 39-40).  This constitutes "actual damage" recoverable under RESPA.

RESPA allows for recovery of non-pecuniary damages, including damages for emotional distress, as "actual damages."  "Because RESPA is a consumer-protection statute, we must construe it liberally in order to best serve Congress's intent."  Renfroe, 822 F.3d at 1244.  Construing RESPA's unqualified language of "actual damages" broadly, and based on the interpretations of "actual damages" in other consumer-protection statutes that are remedial in nature, we see no reason why a plaintiff cannot recover non-pecuniary damages, such as emotional distress, under RESPA."  Ranger v. Wells Fargo Bank N.A., 757 F. App'x 896, 902 (11th Cir. 2018)(allowing claim for emotional damages for RESPA violation); *see also* McLean v. GMAC Mortgage Corp., 398 F. App'x 467, 471 (11th Cir. 2010); Catalan v. GMAC Mortgage Corp., 629 F.3d 676, 696 (7th Cir. 2011); Rawlings v. Dovenmuehle Mortg., Inc., 64 F. Supp. 2d 1156, 1166 (M.D. Ala. 1999).  Moreover, there is no heightened standard no requirement that plaintiff demonstrate "extreme" distress.  Catalan v. GMAC Mortgage Corp., 629 F.3d 676, 696 (7th Cir. 2011)(testimony of loss of sleep, nervousness, being upset and feeling of being "useless"

by not being able to resolve the situation held sufficient to establish emotional damages under RESPA.); Rawlings, 64 F. Supp. 2d at 1164-65, 67 (testimony that the borrower was afraid of losing his home and that he was "real upset" presented question of fact sufficient to defeat summary judgment).

Moreover, Ocwen's argument that these damages are not proximately caused by Ocwen's violations is without merit.  The Halls claim that Ocwen was legally required to reasonably investigate their credit disputes and NOE, and that any reasonable investigation would require a correction of the account in accordance with the Bankruptcy Order.  Had Ocwen made that correction, the loan would have been treated as current after the NOE.  Ocwen's failure to comply with RESPA has directly resulted in the continuation of this nightmare beyond the NOE.

## C.  THE EVIDENCE SUPPORTS THE HALLS' FDCPA CLAIM.

Congress enacted the FDCPA "to eliminate abusive debt collection practices by debt collectors...." 15 U.S.C. § 1692(e).  The FDCPA is a remedial statute, and its provisions are to be liberally construed in favor of consumer debtors.  Agrelo v. Affinity Mgmt. Servs., LLC, 841 F.3d 944, 950 (11th Cir. 2016); Bandy v. Midland Funding LLC, 2013 WL 210730, *5 (S.D. Ala. Jan. 18, 2013).  The FDCPA forbids certain conduct by debt collectors, including collecting amounts not owed and making false representations in connection with the collection of any debt. 15 U.S.C. § 1692e and 1692f(1).

Ocwen's false insistence that the Halls are in arrears falls squarely within the FDCPA's prohibited acts.  The monthly demands for past due sums when the Halls were actually current

clearly constitute attempts to collect sums not owed.  Moreover, it is undisputed that Ocwen's treatment of the loan in arrears has caused the incurring of late fees when the Halls were, in fact, current.  (Doc. 76-2, p. 75).  The collection or attempted collection of the unowed amounts is a violation of 15 U.S.C. § 1692f(1).  See, e.g., Justice v. Ocwen Loan Servicing, No. 2:13-CV-165, 2015 WL 235738, at *11 (S.D. Ohio Jan. 16, 2015)(Ocwen was debt collector and violated the FDCPA when it attempt to collect amounts in excess of those due under loan modification).  The FDCPA also proibits "[c]ommunicating or threatening to communicate to any person credit information which is known or which should be known to be false."  15 U.S.C.A. § 1692e(8).  At all times after April 30, 2018 (the date of the bankruptcy court declaration that the Halls were current), Ocwen knew or should have known that any information reported to the credit bureaus indicating that the loan was in arrears was false.  Yet it continued to do so, and the loan continues to be reported as in arrears.  This is a violation of Section 1692e(8).  See, e.g., Garfield v. Ocwen Loan Servicing, LLC, 811 F.3d 86, 93 (2d Cir. 2016).

Finally, Ocwen's collectors called the Halls hundreds of times attempting to collect past due sums they did not owe.  During this time, Ocwen knew or should have known that the Halls had been deemed current by the Bankrupcty Court.  The FDCPA prohibits "any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt."  15 U.S.C.A. § 1692d.  There is amp[le evidence upon which the jury could conclude that these calls violated Section 1692d and/or Section 1692d(5) prohibition of use of telephone with the intent to "annoy, abuse, or harrass." See e.g., Schumacher v. Credit Prot. Ass'n, No. 2015 WL 5786139, at *2 (S.D. Ind. Sept. 30, 2015)(denying summary jdgment to debt collector regarding 54 calls).

22

Any attempt to justify these actions with a claim that the Halls were in fact in arrears and the collections were justified is foreclosed by the binding effect of the Bankruptcy Order for the reasons stated above.

### D.   THE EVIDENCE SUPPORTS THE HALLS' FCRA CLAIM.

As to the FCRA claim, Ocwen argues (1) that its reporting was accurate; (2) the Halls suffered no recoverable damages and (2) there is no evidence of willfulness to support the punitive damages claims.  None of these arguments has merit.

> Under the FCRA, when a consumer disputes information with a credit reporting agency, the entity furnishing the information must "conduct an investigation with respect to the disputed information." 15 U.S.C. § 1681s-2(b)(1). The purpose of that investigation is to reach one of three potential ending points: "verification of accuracy, a determination of inaccuracy or incompleteness, or a determination that the information cannot be verified." *Hinkle v. Midland Credit Management, Inc.*, 827 F.3d 1295, 1302 (11th Cir. 2016) (citation and internal quotation marks omitted). The Eleventh Circuit has opined that " 'reasonableness' is an appropriate touchstone for evaluating investigations under § 1681s-2(b)."*Id.*

Diehl v. Money Source, Inc., 2018 WL 2995721, at *7 (S.D. Ala. June 13, 2018).

First, as stated above, Ocwen is bound by the Bankruptcy Court's determination that the Halls laon was current in April 2018.  It is undisputed that they have made all their payments since that time.  Therefore, Ocwen is collaterally estopped from claiming that the loan was in arrears in April 2018 and continued that to be in arrears thereafter and, by extension, that it properly determined the credit reporting was accurate. This includes the claim now that the credit reporting was accurate because the loan was in fact in arrears.  If the order is to have any effect at all, it has to foreclose Ocwen's defense premised on actions taken in direct contravention of that order. Because the loan was current in and beyond April 2018, the reporting was inaccurate.  For the

same reasons explained above, Ocwen's investigation of the Halls' credit disputes could not be reasonable because it ignored the binding effect of the Bankrtupcy Court Order.

Second, the FCRA, as RESPA, allows for recovery of pecuniary and non-pecuniary actual damages. Levine v. World Fin. Network Nat. Bank, 437 F.3d 1118, 1124 (11th Cir. 2006)("[a] claim for actual or compensatory damages under FCRA may include compensation for emotional distress in the absence of physical injury or out-of-pocket expenses"). The same damages described above with respect to the RESPA claim are recoverable under the FCRA claim.

Finally, the fact that Ocwen continued to report the loan in arrears when it knew or should have known that the loan had been determined to be current supports the wilfullness claim under Section 1681n. Under Section 1681n(a), a person who willfully fails to comply with any requirement imposed under Section 1681s-2(b), is liable to the consumer for actual, statutory, or punitive damages. Collins v. Experian Info. Solutions, 775 F.3d 1330, 1336 (11th Cir. 2015). A violation willful where the furnisher either knowingly or recklessly violated the requirements of the Act. Levine v. World Fin. Network Nat'l Bank, 554 F.3d 1314, 1318 (11th Cir. 2009) (citing Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 56-57 (2007)). Willfulness is established with evidence that a furnisher verified credit information which it knew or should have known was either false or unverified by its records. Hinkle v. Midland Credit Mgmt., Inc., 827 F.3d 1295, 1307 (11th Cir. 2016)(A reasonable jury could find that Midland either knowingly or recklessly reported debts as "verified" without obtaining sufficient documentation to support that determination). Here, Ocwen knew or should have known that the loan was deemed current (and

it is estopped from arguing otherwise) when it verified the information.  This is a sufficient basis for a jury to find willful violation of the FCRA.

## E.  THE EVIDENCE SUPPORTS THE HALLS' BREACH OF CONTRACT CLAIM.

In defense of the breach of contract claim, Defendants make three arguments: the loan was serviced in compliance with the mortgage and note (because the Halls were in fact one month behind due to the "short" payment); that Ocwen is not a party; and that there is no evidence of recoverable damages.

The first argument suffers the same fate and the principal defenses to the other claims: it is collaterally estopped.  Whether the "short" payment rendered the loan behind was litigated and it was determined that the loan was current as of April 2018.  The Defendants are barred from arguing here that the loan was in fact in arrears.  Because no adjustments were made to align the collection of payments to the finding by the Bankruptcy Court, the loan has been serviced in contravention of the mortgage and note. Every month that Ocwen (on Freddie's behalf) insisted that the payments were behind and failed to apply payments to the month in which they were received constitutes a breach.

As to the second argument, it is true that a service is typically not liable for breach of the mortgage or note because it is not a party to those agreements.  However, the water is muddied here because in July 2013, an assignment was executed assigning to Ocwen all benefits under the Halls' mortgage as mortgagee.  (Exhibit 2). Thus, it appears that Ocwen is in fact a party to the mortgage.  It offers no explanation of the assignment.

25

With respect to damages, Alabama courts have long held that mental anguish damages are recoverable where a breach of contract concerns the plaintiff's home. "We agree that the exception based on a "contractual duty" that is "coupled with matters of mental concern or solicitude" has been applied in situations involving contracts relating to a plaintiff's current residence." Sexton v. St. Clair Fed. Sav. Bank, 653 So. 2d 959, 961 (Ala. 1995)(plaintiffs could seek emotional damages against contractor who took wrongful actions against them, including foreclosure); see also, Liberty Homes, Inc. v. Epperson, 581 So.2d 449, 454 (Ala.1991); Orkin Exterminating Co. v. Donavan, 519 So.2d 1330 (Ala.1988). B & M Homes, Inc. v. Hogan, 376 So. 2d 667, 671-72 (Ala.1979); F. Becker Asphaltum Roofing Co. v. Murphy, 224 Ala. 655, 141 So. 630, 631 (1932); Baldwin v. Panetta, 4 So.3d 555 (Ala.Civ.App. 2008).  It is axiomatic that breach of a mortgage agreement which leads to a fear of foreclosure of one's home "will necessarily or reasonably result in mental anguish or suffering." Taylor v. Baptist Med. Ctr., Inc., 400 So. 2d 369, 374 (Ala. 1981). Accordingly, in First Commercial Bank v. Spivey, 694 So. 2d 1316, 1320 (Ala. 1997), the Alabama Supreme Court upheld a $450,000 emotional damages verdict involving misdeeds by a bank which resulted in the foreclosure of a mortgage, among other things. 694 So. 2d at 1320. Courts in other jurisdictions have found that foreclosure or the prospect thereof can give rise to claims for emotional distress damages on a breach of mortgage claim. DeGolyer v. Green Tree Servicing, LLC, 291 Ga. App. 444, 449, 662 S.E.2d 141, 147 (2008); Matthews v. Homecoming Fin. Network, 2005 WL 2387688 (N.D. Ill.Sept. 26, 2005); Johnstone v. Bank of Am., N.A., 173 F. Supp. 2d 809 (N.D. Ill. 2001)(possibility of foreclosure sufficient to state emotional distress damages); Blanton v. Duru, 178, 543 S.E.2d 448, 452 (Ga. App. 2000).

26

**CONCLUSION**

For all the reasons stated above, the Defendants' Motion for Summary Judgment is due to be denied.

Respectfully submitted this the 20th day of November, 2020.

/s/Kenneth J. Riemer
**KENNETH J. RIEMER**
**EARL P. UNDERWOOD, JR.**
Attorneys for Plaintiffs

OF COUNSEL:
UNDERWOOD & RIEMER, P.C.
21 S Section Street
Fairhope, Alabama 36532
Phone:   251.990.5558
Email: epunderwood@alalaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing has been served upon the on all parties via this Court's CM/ECF electronic filing system on December 9, 2020:

/s/ Kenneth J. Riemer
KENNETH J. RIEMER (RIEMK8712)

27